1821-06 Curtis Parks v. Willis Chapman Oral Argument Not to Exceed 15 Minutes per Side Mr. Hall for the Petitioner Appellate Good morning and may it please the Court. Bradley Hall from the Michigan State Appellate Defender Office on behalf of Curtis Parks. With me at Council Table is Colleen Fitzharris from the Federal Defender Office in Detroit, my former office. I've reserved three minutes rebuttal time. Curtis Parks was convicted by an all-white jury and this was not an accident. His court mistakenly but systematically excluded almost half of the African-American jury-eligible population from the jury pool in Kent County. In spite of that, his jury veneer had four African-Americans. First of all, you're not contending that the exclusion of the African-Americans from the jury pool was intentional or even knowledgeable, are you? No, not the systematic exclusion. And in the systematic exclusion, that was not a structural error, was it? It was, Your Honor. We believe it was. In spite of the systematic exclusion from the jury pool, his veneer had four African-American jurors. We know this from the record. And his prosecutor methodically and deliberately and intentionally excused and removed each and every one of those four African-American jurors without an objection, without a reason, without a race-neutral explanation. Mr. Parks brought both of these claims to the state courts in a unique Michigan procedural vehicle prior to direct appeal with the record... Without a racially neutral explanation, sort of amidst the fact that the issue wasn't raised, so they were never asked to give an explanation. That's correct. So it's kind of hard to fault the government for that. But I answered a question about the jury selection. Both of my distinguished colleagues have been trial judges, so they're much more familiar probably with picking a jury than I am. But my understanding is there's a lot of components to this. And I was just trying to figure out what all of the information that was available to the lawyers in the courtroom who were picking the jury. And we have parts of a transcript, I think, or affidavits that try to recreate a transcript. But, for example, was there a questionnaire that was given to all the jurors or potential jurors before jury selection? My recollection is that there are questionnaires that do not ask about race. That's fine. In other words, those questionnaires all provide significant information to counsel that they then consider. How old you are, where do you live, where did you go to school, what's your job? And then was there a time when there were questions that were asked to all the jurors as opposed to sort of one juror individual? Sometimes I know during selection they'll say, look, has anyone ever received a ticket? Raise your hand, and people may ask questions to follow up on that. Was that done here, do you know? I would be afraid to say for certain, but typically, yes. There's a courtroom-wide voir dire, and then the attorneys will ask more specific questions. I guess what just concerns me is that there's a whole volume of information that was likely available to both sides that were picking the jury. And you've pulled out just a couple of little snippets and said, well, comparing those, obviously these decisions were made based upon race. And that just to me emits a whole volume of information about a whole bunch of other demographics and other background about these jurors that we just don't know about. Well, Your Honor, I don't think and I hope we haven't said that obviously these decisions were based on race. What we've said is obviously these raise a prima facie case. I mean, look at Batson itself. Batson, four African-American jurors, excused by the prosecutor. Every African-American juror excused by the prosecutor, an objection raised, and the trial court says, sorry, he gets to excuse whomever he wants. And the U.S. Supreme Court says, no, that's not how it works. We need an explanation. All we're asking for here is an explanation. Mr. Parks is entitled to it. The law demands it. And it would have been very easy practically in the months after trial before direct appeal when this was all presented to the Supreme Court. I mean, just the fact, I mean, assuming those numbers are right, which there's some debate about whether, I mean, even the races I think had to be, that information had to be recreated. But assuming it's all right, there's just even a basis for maybe a different lawyer standing up and objecting to the jury selection process. Again, there's a whole lot of information. And, I mean, part of this does go to the second problem, which is then the government having to justify it. But because the lawyer here didn't raise it, we don't know, we don't have any of that information available to us about what the government might have said in response. And that's why a hearing was necessary. And here we are 15 years, 16 years later still asking for that hearing. And we understand the practical difficulties. And the state says the fault lies with Mr. Parks. The fault does not lie with Mr. Parks. He gathered his affidavits in the weeks and months after trial before direct appeal and presented this directly to the Michigan Court of Appeals requesting a hearing which is commonplace. Is it possible that Parks' lawyer may have not wanted these people on the jury for some reason? That is exactly the sort of question that could have been discussed, analyzed, and resolved at a hearing during the Batson. But if he wanted them on the jury, then he wouldn't have brought a Batson objection. He may have thought, you know, I was going to make those strikes myself. There's an issue about an engineer. Each one struck an engineer. And so maybe – so we're really – it just feels like we're really speculating as to what was going on in the minds of all the lawyers and all the information they had. But this is why you're asking for the hearing now because it is speculative. And there needs to be a more fulsome record developed in order to get answers to those and other questions, correct? That's exactly right. Because Mr. Parks was in kind of a tough position. He's got an advocate who didn't make timely objections. And then you had this thing made after the hearing. Batson contemplates actions and explanations by the person who's making the racial strikes. It also implicates the role of the judge in preserving the trial things. And you're saying that the record is really devoid of all of those components being given fidelity during this proceeding. That's absolutely correct, Your Honor. All we're asking for is a hearing to develop that record. What's the impact of the fact that his counsel said he was satisfied with the jury? We do. And counsel being ineffective for failing to raise this objection and ask for an explanation. So are we here on an ineffective assistance of counsel claim? Yes, we are. So what is the standard that we use to judge that? The standard on ineffective assistance – I think the Weaver question, which is argued more under our fair cross-section claim, I think it's going to implicate the Strickland-Batson claim as well. Even if we get a remand, have a hearing, and a finding that these were race-based exclusions and unlawful, there's still a question under Weaver whether that constitutional violation violates and implicates fundamental rights. And it absolutely does. I mean, we are talking about what the Supreme Court recently described as the sort of toxin that even in small doses can be deadly. This is race-based discrimination. It implicates the entire process, the entire justice system. And a new trial would absolutely be warranted if counsel is found to have been ineffective for failing to raise a meritorious Batson objection that would have resulted in a new jury selection. I mentioned the fair cross-section claim. Under Weaver, we do think – obviously we've been here a number of times on these claims and we have the Ambrose standard. Weaver, really, it's our contention, upends all of that. Ambrose says you have to look at the strength of the evidence, no matter the nature of the error. And I think the Supreme Court was very clear that that is not always the case. You look to whether – first you can look at whether the evidence would have made a difference in the outcome. Of course, that's one way to get a new trial on a structural error. But also you look at whether the error was the type of error that affects fundamental fairness and fundamental rights. And it's sort of a contextual approach to this. And you look at the rights that are protected or sought to be protected by this claim. And here we have the right to have a jury drawn from a fair cross-section of the community and have a jury free from intentional racial discrimination. Those are precisely the sorts of fundamental rights implicated by Weaver. The Supreme Court didn't tell us what exactly – what kinds of specific cases there's such pervasive structural error that we can ignore other concerns and just find a right to a new trial. Or it left that to your honors. Right, and so we have – so our court has some precedent in the area, Ambrose. Correct. And the Supreme Court certainly didn't tell us that that was wrong. Nope, not explicitly, Your Honor. The Supreme Court did say, though, and we have in Weaver, we have a temporary closure for practical, pragmatic reasons, not by the judge, by court staff, that really didn't implicate fundamental rights that the rule requiring open courtrooms is designed to protect. That is night and day different than what we have here. We have two very significant pervasive constitutional errors affecting the racial makeup of this jury and the ability of the entire community to participate in this process that were violated. And the right sought to be protected by this, the community's right to have a voice, a defendant's right to have a fair and representative jury, and our confidence in the entire criminal justice system. So on the systemic makeup of the jury, do we look at – how should we consider the comparison of the percentages of African Americans in the community vis-a-vis the percentage on the jury? Because it was not wildly disparate, even though there had been this exclusion.  This court has already found that the disparity levels in this case do give rise to a meritorious, fair cross-section claim, meaning that it was not a fair and reasonable representation. Now we have a community in Kent County that is largely white. The African American population is relatively small. But as a comparative matter, it's almost half of that population. The zip codes that were excluded from jury service, including Mr. Parks' zip code, I want to mention that. I mean, at trial, when we're talking about the strength of the evidence, and he's questioned about, you know, you expect the jury to believe that somebody's hollering down to you to come up and propositioning you from her window. And his response is, if you lived in my neighborhood, you wouldn't think that that's such an outrageous claim. Well, guess what? There was nobody there in his neighborhood because they'd excluded that zip code with several others in the city of Grand Rapids, where minorities tend to live. So if we're talking about the strength of the evidence and whether it would matter in this particular case, if we even get there, finding that Weaver doesn't change matters, this is the sort of case where population and diversity by zip code and by neighborhood and the sorts of things that people see was directly at issue at trial and part of the evidence. Can I take you back to the Strickland claim? And Judge Batchelder was asking about the elements for that claim. And so you would agree that you have to show some form of prejudice? Some form, correct. Yeah, and so what was your client's explanation for the bloody lip? What's his explanation for the bloody lip? I don't know that he had an explanation in his testimony for the bloody lip. If there was, I don't recall it. I mean, her story was that he caused that injury and I think there were stitches. That's correct. 12 stitches. That's correct. He has no explanation for how she got a bloody lip? I believe that's correct. And here we're looking at the strength of the evidence and whether it would have made a difference to a jury with a different demographic makeup. It has always been our contention that that should not be and is not an appropriate measure here, that the court shouldn't engage in that. And we've been fighting this battle case after case after case. I think Weaver opens the door again where the Supreme Court acknowledges, look, prejudice doesn't just mean would the outcome have been different to determine prejudice, we look at the right at issue and the interest sought to be protected by that right. The right to have a fairly constructed jury free from discrimination is not primarily about accurate results. It's not, and that's not the prejudice inquiry here. Thank you, Your Honors. Good morning. May it please the Court. Eric Costuccio from the Attorney General's Office on behalf of the state. I just want to make a couple of points about the fair cross-section argument before turning to the Batson challenge. And that is that there's no dispute that the fair cross-section claim is defaulted. The only issue really is the one of prejudice. And this court has binding precedent under Ambrose where the claim relates to a possible structural error that there's still an obligation to prove actual prejudice, that there's a reasonable probability that the outcome of the jury would have been different. And the primary consideration for that analysis is the strength of the case. Weaver doesn't change that. And the reason Weaver doesn't change that is the opinion itself, it says, we need not decide that question here, quote from the case. And it also says, this opinion does not address whether the result would be any different if the errors were raised in an ineffective assistance of counsel claim on collateral review. Weaver reserved the question. This court has binding precedent on the very issue. So in the summary orders in Wellborn and Carter, this court has said, Weaver doesn't change the Ambrose analysis. And if you begin with the actual prejudice standard, which is the governing one, Mr. Parks has an obligation to show that there was prejudice here. And if you look at the case, the evidence was overwhelming against Mr. Parks. He was caught in the act during the rape when the police came into the house. His claim is consent. The woman was bleeding from her anus and from her mouth. She had 7 to 14 stitches placed in her mouth. And then he lied about what occurred because when the police first come into the house, he has his pants down and he's raping this woman, and he lunges at the police. And then in his own testimony, he denies having lunged at the police. He denies having been undressed when the police came into the house. The jury convicted him in 45 minutes. The case was overwhelming. So once you apply the actual prejudice standard, Mr. Parks is unable to show actual prejudice on the fair cross section. So he has a second claim, and that's the Batson claim. Now on the Batson claim, the Michigan Court of Appeals ruled on the merits of the ineffective citizens of counsel claim. As a consequence, you have a merits determination under 2254D, which means under pinholster, this court is limited to the record that was presented in the state court. And this court has reiterated that very point in Ballinger, a Judge Seiler opinion in which he reiterates you can't create a new record. In fact, in that case, there was a new record generated, and this court then disregarded it because the first analysis has to look at the record itself. Now here the prosecution exercised seven preemptive challenges. Now you have to remember this trial occurred in October of 2001. In fact, the circumstances that are at issue here occurred on the morning of October 15, 2001. It was 18 years and a day from today ago. So the claim here is there is a need for a hearing to ask that prosecutor back from 2001, what were her motivations for the exercise of her seven preemptory challenges, which included the exercise of four preemptory challenges against African Americans. The reason this record wasn't developed is there was no objection. We'd also have to ask the defense counsel why he didn't object, right? That's exactly right. I think that's part of the analysis. But I think you also have to look, since there's a merits determination, the decision of the state courts doesn't have to be one in which you might just think differently. It has to be an extreme malfunction. It has to be something that's essentially egregious. And on this record, in fact, what the Michigan Court of Appeals said is the same thing as what Judge Lawson said below is that there are just a handful of jurors that are at issue. And if you look through, it's not a mystery why these jurors were – why there was a – The defense counsel did object or did excuse – did remove on preemptories a number of jurors. Yes. I mean, it was four, five, six or something. Right. I think it was four for the defense, seven for the prosecution. It's not a case where the lawyer wasn't making some strategic decisions. No. Clearly the lawyer was engaged in picking which jurors – I think that's exactly right. I mean, the other cases – like one of the primary cases that's before 2003 in which Mr. Parks relies, there was 11 preemptories. Ten of the 11 African-Americans were excluded or removed from the veneer. Here there were four. And if you look through, one lived two blocks away. One says a victim really has to resist in order to be demonstrated to have been raped. A third worked for the probation department, always worked with criminal defendants and never with victims. And the fourth was an engineer. And I have to say, I was a trial prosecutor. You don't like people who want mathematical precision sitting on your jurors. But there was also a white engineer, an electrical engineer. True. You don't like engineers, but the prosecutor did not excuse them. But the prosecution hadn't exhausted all of their preemptory challenges. They had not. They had not. Right, but in other words – They had not exhausted those, but I'm saying that he went through – You are right, but she could have then, at the point in which Mr. Williams is still on the jury, she could have asked that he be removed. It would have been different if she had exhausted all of her preempting challenges and not asked Mr. Williams, the other engineer, not to be removed. Of course, Mr. Williams, like right out of the box, had said he had a close friend as a police officer. So it may have been – Well, in any event, the point is this, that really on this record, there is no case from the United States Supreme Court. I mean, this decision, it's a historic decision. This is really a different kind of process than just a direct review analysis. You look at what the Michigan Court of Appeals had, and you look at the universe of cases that are relevant for its analysis, there is nothing like this where you have essentially reasons that are apparent from the record itself that would provide a race-neutral basis. In fact, in the motion to remand that occurred in September of 2002, more than about a year after the trial, one of the things the prosecution had said in its appellate brief, in opposing any relief, saying, it's too late, it's going to be too long ago in order for it to be a meaningful review to ask the prosecution what the basis were for her decisions for the peremptory challenges. And that brief was written in September of 2002. We're now 16 years later, and the expectation is that we're going to be doing anything other than essentially a record review where there are reasons apparent from the record itself. The idea that somehow there's been an extreme malfunction where defense counsel did not object in the first time that a Batson challenge is raised on appeal is long after the time which the relevant events occurred. There is nothing from the United States Supreme Court precedent, which is the universe, the established Supreme Court precedent, that would suggest this is a failing of the Michigan Court of Appeals, that it somehow had a duty to remand this matter for an evidentiary hearing where there were race-neutral reasons apparent from the record itself. So consequently, the right outcome is really how Judge Lawson reviewed it below, which is to say, we see that there's no prima facie case that's been established, at least it's not an extreme malfunction. There's no clearly established Supreme Court precedent, which is going to bind this court that requires it to say what the Michigan Court of Appeals had done was wrong. Batson doesn't require it. Miller-Cockrell doesn't require it. Those are the cases that are before August of 2003, and that's in which the merits of the decision came down from the Court of Appeals, because, of course, Green v. Fisher will subscribe the universe. It has to be existing Supreme Court decisions at the time in which the Court of Appeals ruled. So there was nothing to tell the Court of Appeals that somehow they were duty-bound to remand when they can look at the record itself. Their analysis is, what they say is, there's nothing from this record that would make us think that these were race-based decisions. You were talking about just a handful of jurors. I live two blocks away. Well, it might be a handful of jurors, but it was the universe of African-American jurors in the pool, so you only had a handful to begin with. That's one of the things you're right on, but what makes this hard is that Kent County has a relatively small percentage of African-Americans. In fact, the thing here is I think the percentage in the county is 8.24 percent at the time of the census from 2000. And that's coupled with the computer glitch that excluded certain zip codes. Exactly. But the computer malfunction created this kind of small reduction, although actually for this specific veneer, four out of 45 would have matched the percentages in the population almost exactly, and that's one of the points we make in kind of the fair cross section analysis is that the idea that somehow this kind of claim, a fair cross section claim, even if somehow the Supreme Court later did identify rare structural errors that are fundamentally unfair, this wouldn't fall within because the fact of the fair cross section has a very attenuated relevance for the actual fairness of the actual pettit juries because of the small numbers it's taken. We're talking about maybe one or two missing prospective jurors in the likelihood as a random matter. In fact, one of the pieces of analysis I provided to the court is the idea that if you look at this as a random matter, the likelihood that this may have had some practical effect in the pettit jury is less than 50%. I mean, for the fair cross section claim, really it seems to me once you see that Ambrose continues to govern the case, really I think that's a relatively easy matter to resolve. The Batson case obviously has the court a little concerned in asking questions, but I think you have to remind kind of the role being played here looking at the Michigan Court of Appeals because the standards are so high for there to be a basis for relief. The request here, the ask of Mr. Parks is he wants to expand the record. I encourage the court to kind of reexamine Ballinger and reexamine Pinholster. In order for him to get to that new hearing, he has to show that the decision of the Michigan Court of Appeals was objectively unreasonable. It was an extreme malfunction before he has a right to ask for that hearing. There has to be a 2254-D1 analysis before you get to the 2254-E2 point. Ballinger makes that point. So when you look at this record, what was before the Michigan Court of Appeals, what it had in August of 2003 when it reached its decision, you have to say, what did the Supreme Court tell me to make that clear that this decision was outside the range of possible reasonable jurists? Judge Lawson, even though he had this overlay of deference that he was supposed to impose, in fact, essentially it was a de novo review in which he said you can look at these jurors and you can see the race-neutral reasons for the preemptory challenges. Now, I think he's exactly right, even though the analysis really has to be of a higher level of deference, which is. . . on his legal advocate to advocate for him and to know the rules and exercise those rules in his best interest. Here, Mr. Parks is saying, my lawyer didn't do that. I've got an ineffective assistance of counsel claim. How should we look at those two allegations together? Because they're interrelated, the ineffective assistance of counsel claim and the Batson claim. If you're looking at those together, how should we view those? Well, I think this, because I was reviewing Cockrell, which is one of the cases from the United States Supreme Court, and in fact was looking at the issue about whether there's a prima facie case. And in Cockrell, it was the circumstance in which the prosecution had excused 10 of 11 jurors and then had asked different questions based onto the African-American prospective jurors and to the white jurors. And there had been a history of discrimination in the Dallas prosecutor's office of systematically excluding African-American jurors. Like in the Flowers case, the Supreme Court handed down. Right. And then you compare it. Oh, and you had the shuffling where you could see the jurors and then you could reconfigure them in the courtroom. The prosecution would have the option of doing that. Think about the evidence that was present in that 2003 case and what the United States Supreme Court said is, in that circumstance, we're going to grant a certificate of appealability. And then in 2005, the issue came back up to the United States Supreme Court. Contrast it to this. This we have four prospective jurors. Nope. And in that case, the prosecution brought a motion, pretrial motion, saying, I want to show you under swaying, that was the prior case, how there's been the systematic exclusion. And the trial court said, nope, nothing. Here we have a handful of preemptory challenges being exercised. Someone who lives two blocks away, someone who says the victor has to resist, someone who only works with criminal defendants, and an engineer. This isn't rocket science. I've been a prosecutor. There was a reason that the defense counsel didn't object. It's because they knew the person who lived two blocks away had to be excused. They knew that the prosecution was going to get rid of the probation officer because the probation officer works with criminal defendants. They knew the person who says the victims have to resist, they probably could have excused that person for cause because that's such an obstacle to actually applying the law properly. I'm just curious. You say it was obvious that the person who lived two blocks away had to be excused. Wouldn't that person have to be excused only if they had some knowledge about the case? But she said that. She said, I heard about this. So it's not the distance, it's the knowledge that she had. She knew something about the case. Oh, I heard about that, right. You can't sit. So, I mean, really we're left with one juror where the prosecution got rid of an engineer. And I've tried my 25 murder cases. You don't want engineers on your jury. You don't want people who watch CSI. You don't want them because it's not a mathematically precise inquiry. So in any event, that's why it's in the case law. It's out there. In other words, anyone who does trial practice, they look at this record and they think, oh, yeah, I get it. This is like night and day with the Cockrell case. Or even the Batson where they had this historic in the south where there's this known role of excluding African-American jurors. And the idea that somehow what happened in Kent County. Let me stop you and ask you because I know you're almost out of time. So what standards should we be applying in reviewing this case? For the fair cross-section question, it's the actual prejudice test. And he can't meet the actual prejudice test because of the overwhelming evidence of his guilt. For the Batson challenge, it's the 2254D merits determination. Is this an extreme malfunction when the Michigan Court of Appeals said there is nothing nefarious about this record that would warrant a showing of a prima facie decision? Since there's no clearly established Supreme Court precedent that would indicate that that's the wrong decision, that that decision has to be affirmed or essentially not to be errored. The brief, the appellant's brief, certainly talks about all of this in Strickland terms, but you're not. Ultimately, this is a merits determination from the... So you don't view this as an ineffective assistance of counsel situation? It's the double deference. Cullen talks about this very point about double deference. You have Strickland plus because you have the Strickland test overlaid with the AEDPA test. It is a Strickland standard that's being reviewed, but it's through the lens of AEDPA. So I wanted to emphasize the highest threshold, and the AEDPA provides the highest threshold. Strickland's a tough test already, but this is now added to the AEDPA standard. So it's Strickland plus AEDPA, double deference. And the state would ask that this court affirm the decision below. Any further questions? Thank you. Your rebuttal. Thank you, Your Honors. I want to agree with opposing counsel that we do on this Strickland-Batson claim need to answer the 2254D question first. And this was an extreme malfunction in the state process. This was an objectively unreasonable decision. Look at the Michigan Court of Appeals decision. First, it's just confused. It says, Mr. Parks has not filed a motion for a new trial and tried to develop the record on this Batson and Strickland claim, therefore, we're limited to the existing facts. Well, that was wrong, and two paragraphs later, the court acknowledged he'd filed a motion and sought a hearing, but we declined that. We denied that motion, so we're stuck with the existing record. So we have an internally inconsistent and confused order from the Michigan Court of Appeals, again, less than a year after trial, with affidavits and a record and a request for a hearing. They denied it. Batson doesn't say you need all this history and what you had, statistics and everything like in Cockrell. Batson says you had four jurors who were excused by the prosecutor, four black jurors excused by the prosecutor. You're entitled to an explanation. That is plain as day. That is simple. That is black-letter law that has clearly established Supreme Court precedent. Well, it says there has to be an inference that the removal was because of race. That creates a prima facie case. Right, but the inference question, as I said earlier, has to turn more on just solely how many African Americans were in the jury pool and were they all excluded. I mean, there has to be more to it than that, and we don't know all this other information. We don't know why defense counsel didn't object, and I know you want a hearing, but to me, given where we are, as your opposing counsel mentioned, the various layers of review under AEDPA and Strickland, that's an awfully high standard, I think, for you to meet. And you have basically one fact, I think, which is there are four, an important fact, but four African American jurors, they were all removed, and that's pretty much all you have. Exact same fact we had in Batson. Exact same fact. Four African Americans. So you're saying that the removal of the four African Americans, the only African Americans in the jury, that created an inference, and the prosecutor could have rebutted that inference by coming, I mean, had there been, I guess, an objection, by coming forward and providing a race-neutral reason for her actions. Absolutely, and that's what the law demanded, either at trial with an objection by competent defense counsel or a few months later on direct appeal when that hearing was requested. But since that time, we've got the Michigan Court of Appeals, the Attorney General's Office, and the district court inventing reasons. Batson was a direct review case? Batson was a direct review case. There was an objection, correct. Mr. Parks' attorney did not object. When you say this is just like Batson, the only way at all it's just like Batson is the posture is completely different. Well, the claim was presented to the Michigan Court of Appeals the first time, or the courts, the first time Mr. Parks had an opportunity, before direct appeal. Batson came up on direct appeal with an objection and no record. There was no colloquy. There was no race-neutral explanation, and the Supreme Court said not enough, and they sent it back. They didn't say, well, one's an engineer, and we can think of a lot of reasons why these people might have, good reasons why these four African Americans might have been excused. They sent it back and said these are the steps. Conduct the inquiry, and that's what Mr. Parks asked for on direct review before this case reached its merits determination on appeal, and he didn't get it. That was an unreasonable application of federal law. We pierced at pedefrance, and now there is a fact question that needs to be resolved, and it is not Mr. Parks' fault that we're still trying to answer that question this many years later. Thank you, sir. Thank you. The matter is submitted, and we will give you a decision in due course. Thank you. Thank you.